**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 8, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

SABRINA CAGE,

Defendant-Appellee.

No. 05-2079

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-03-766 JP)**

Laura Fashing, Assistant U.S. Attorney (David C. Iglesias, United States Attorney; and James R.W. Braun, Assistant U.S. Attorney with her on the briefs), Albuquerque, New Mexico for the Plaintiff-Appellant.

Robert J. Gorence, Robert J. Gorence & Associates, P.C., Albuquerque, New Mexico, for the Defendant-Appellee.

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **TYMKOVICH**, Circuit Judge.

**LUCERO**, Circuit Judge.

This case asks us to determine the limits of reasonableness in the context of sentencing decisions. The United States appeals a district court decision sentencing Sabrina Cage to six days in prison and three years of supervised release for the crimes of conspiracy to distribute 500 grams or more of a mixture and substance containing methamphetamine and using a telephone to facilitate a drug trafficking offense. Although the district court properly calculated the sentence range under the Federal Sentencing Guidelines at 46-57 months imprisonment, it used its discretion under United States v. Booker, 543 U.S. 220 (2005), to conclude that six days' imprisonment was sufficient, but not greater than necessary to meet the considerations enumerated in 18 U.S.C. § 3553(a). Under Booker, we review district court sentencing decisions for reasonableness. Because the facts of this case are not so dramatic as to justify such an extreme divergence from the advisory guidelines range, the district court's sentencing decision was unreasonable. As such, we **REVERSE** and **REMAND** for resentencing.

## I

Conducting operations out of both California and New Mexico, the Cuevas family orchestrated a major methamphetamine distribution ring: Nelida Cuevas, the family matriarch, was deeply involved in the family's drug distribution enterprise and her four sons, Arturo, Francisco, Ricardo, and Jorge Cuevas were the ring leaders of the operation in New Mexico. Their sister Veronica Cuevas,

Nelida Cuevas's youngest child and only daughter, was frequently dispatched to pick up large quantities of methamphetamine from an uncle in California to be sold in New Mexico. Once the methamphetamine was transported to San Juan County, the Cuevas family distributed it to users through a distribution chain including Cuevas family members and outsiders.

In the course of investigating the Cuevas family criminal enterprise, the federal government obtained authorization to tap a cell phone to which Ricardo Cuevas subscribed and that Ricardo's girlfriend, Sabrina Cage, frequently used. Cage lived in Ricardo's home and was not employed during the time that she lived with him. They had a son together, who was an infant at the time of the investigation. Although not central to the conspiracy, Cage did substantially and knowingly assist the enterprise. Evidence obtained from the wiretap shows that Cage took orders for drug sales and helped facilitate drug transactions. Cage also relayed messages between Ricardo and other members of the Cuevas family about drug deals, vouched for the reliability of members of the family as drug couriers, and, on one occasion, tried unsuccessfully to convince a friend to rent a car under a false name for Cuevas family use.

On April 23, 2003, Nelida and Veronica were at Ricardo's house. Ricardo called Cage and instructed her to give $1,000 in cash to Nelida and $200 to Veronica. After Nelida and Veronica drove away, agents stopped and arrested them, and found $17,000 in Veronica's luggage and $3,815 in Nelida's luggage.

Within an hour, agents began executing search warrants in various locations controlled by the Cuevas family. At Ricardo and Cage's residence, agents found 945 net grams of methamphetamine, over $2,000 in cash, a loaded handgun, and two gram-capable scales. In total, the searches of all Cuevas family properties uncovered well over two kilograms of methamphetamine and several firearms.

Cage pled guilty to one count of conspiracy to distribute 500 grams or more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (B)(1)(a) & 846, and one count of using a telephone to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b). She agreed that 1.5 kilograms or more of actual methamphetamine is attributable to her, which, she acknowledged, would place her at a base offense level of 38. With the parties' agreement that Cage should receive an adjustment for her mitigating role in the offense, and with the government's concession that Cage was a minor participant in the criminal activity and that she met the requirements of the "safety valve" provision,[1] Cage faced a total offense level of 23. Given

---

[1] The sentencing provision of the drug statutes to which Cage pleaded guilty contains a safety valve that allows for the court to depart downward from the statutory minimum sentence. 18 U.S.C. § 3553(f). The safety valve applies if "(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines; (2) the defendant did not use violence . . . or possess a firearm or other dangerous weapon . . . in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and was not engaged in a continuing criminal enterprise . . .; and (5) . . . the defendant has truthfully provided to the

(continued...)

that her criminal history placed her conduct in sentencing category I, Cage was exposed to a guidelines range of 46 to 57 months.

Although she declined to object to the guidelines calculations in the Pre-Sentence Report, Cage did move for a downward departure. She argued that her incarceration would leave her infant son in the care of her mother, who was already raising three children under the age of five, thereby justifying a departure under U.S.S.G. § 5H1.6. Upon finding that "this is not a situation where the family ties and responsibilities fall outside the heartland of cases," the court denied the motion for downward departure. The court then sentenced Cage at the bottom of the guidelines range to 46 months' imprisonment. Aware of the Supreme Court's pending decision in Booker, 543 U.S. at 220, the district court fashioned an alternative sentence that it would apply if the Sentencing Guidelines were found unconstitutional. The alternative sentence imposed by the district court was six days' imprisonment.

Cage began serving a 46 month term of imprisonment, but, on the day that Booker was decided, she filed a motion to apply the alternative sentence. In opposing the motion, the government argued that the court lacked jurisdiction to impose the alternative sentence, that the Booker decision did not meet the

[1](...continued)
Government." Id.; see also United States v. Tolase-Cousins, 440 F.3d 1237, 1244 (10th Cir. 2006).

- 5 -

condition precedent to the alternative sentence because it did not hold that the Guidelines were unconstitutional in their entirety, and that the sentence of six days' imprisonment was unreasonable. After overruling the government's objections, the court issued an "Order Directing Bureau of Prisons to Apply Alternative Sentence and to Immediately Release Defendant Sabrina Cage from Custody," with which the Bureau of Prisons complied. The order explained that the district court had examined the evidence and calculated the proper sentencing range under the Guidelines and that the alternate sentence of six days' imprisonment was sufficient, but not greater than necessary, to meet the considerations enumerated in 18 U.S.C. § 3553(a). The government appeals and seeks reversal of this order.

## II

Before determining the reasonableness of the alternative sentence, we must assure ourselves that we have jurisdiction to hear this appeal. Cage moves to dismiss the appeal, arguing that the government filed its notice of appeal late and that we thus lack jurisdiction. Under the unique circumstances of this case, we think that the government filed its appeal within the specified time limit. Cage's motion to dismiss, therefore, is denied.

"The filing of a timely notice of appeal is an absolute prerequisite to our jurisdiction." Parker v. Bd. of Pub. Utils., 77 F.3d 1289, 1290 (10th Cir. 1996). The government must file its appeal within thirty days of the entry of the order

being appealed. Fed. R. App. P. 4(b)(1)(B). Cage asserts that the government is appealing the initial judgment, which imposed a sentence of 46 months' imprisonment with an alternative sentence if the Sentencing Guidelines were found unconstitutional. Because this judgment was entered on September 2, 2004, and the government filed its appeal on March 23, 2005, Cage argues that the government filed its notice of appeal late. We disagree. What the government is appealing, instead, is the "Order Directing Bureau of Prisons to Apply Alternative Sentence and to Immediately Release Defendant Sabrina Cage from Custody," entered on February 24, 2005.

Pursuant to 18 U.S.C. § 3742(b), the government may appeal sentences: (1) imposed in violation of the law; (2) imposed as a result of an incorrect application of the Guidelines; (3) that are less than the minimum guidelines sentence; or (4) imposed for an offense for which there is no Guideline. No statutory justification existed for appealing the 46 month sentence imposed on September 2, 2004.

Because of finality requirements, the government did not have statutory authority to appeal the six day sentence prior to February 24, 2005. The pertinent statute authorizes the government to "file a notice of appeal in the district court for review of an otherwise final sentence," 18 U.S.C. § 3742(b), and we conclude that the sentence of six days' imprisonment was not a "final sentence" within the meaning of the statute until the court entered the February 24th order that made

- 7 -

the six day sentence enforceable. Until that date, Cage was serving a 46 month sentence, not a six day sentence, and accordingly the latter sentence was not final. See, e.g., United States v. Jackson, 903 F.2d 1313, 1316 (10th Cir. 1990) (discussing the "finality" of a sentence, where the district court attempted to anticipate the Supreme Court's decision in Mistretta v. United States, 488 U.S. 361 (1989)).

Moreover, the alternative sentence relied upon a condition precedent, which did not occur until well after the time lapsed for appealing the September 2nd order. Further, it was unclear to the parties whether the condition precedent ever occurred – they disputed whether the Booker decision met the condition listed in the alternative sentence. Given this uncertainty, the government could not have appealed the conditional alternative sentence until after the district court found that the condition precedent it imposed actually had occurred and ordered execution of the alternative sentence. A ruling to the contrary would leave this court in the unacceptable position of either ruling on the legality of a sentence that a defendant may never suffer or withholding decision until an uncertain future date and then deciding for the district court whether conditions it imposed had or had not been met. Because the government appealed the district court's February 24th order within the statutory time period, we have jurisdiction to consider the government's challenge.

Further, we reject the government's position that the district court lacked jurisdiction to impose the alternative sentence in this case. The government readily concedes that district courts have authority to impose alternative sentences. Although we generally disapprove of alternative sentences, and under certain circumstances – unlike like those present in this case – will find them procedurally unreasonable under Booker, we have affirmed alternative sentences in the past. See United States v. Garcia, 893 F.2d 250, 251, 256 (10th Cir.1989).

Rather than quarrel with the district court's authority to impose alternative sentences in general, the government maintains that the court below conditioned application of the six day alternative sentence on circumstances that did not occur. The district court stated that the alternative sentence would apply "only in the event the United States Sentencing Guidelines and the Sentencing Reform Act of 1984 are determined to be unconstitutional." Because the Supreme Court in Booker did not hold that the Sentencing Guidelines were unconstitutional in their entirety, but rather held "that mandatory application of the Guidelines violates the Sixth Amendment when judge-found facts, other than those of prior convictions, are employed to enhance a sentence," United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir. 2005), the government argues that the district court lacked authority to order application of the alternative sentence. The district court addressed this argument, stating: "The intent, when I said that the alternative sentence would apply in the event the guidelines sentence were determined to be

unconstitutional, was that if the Court were to rule that the guideline sentence was not a mandatory sentence, but that a district judge would have discretion to apply, then the alternative sentence was the proper sentence." Upon review of the record, it appears plain that the district court fashioned an alternative sentence reflecting the sentence it would impose in the exercise of its discretion, and which it intended to apply if the Court in Booker afforded district courts such discretion. Because Booker held that a district court commits error "by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction," Gonzalez-Huerta, 403 F.3d at 731-32, we conclude that the district court had jurisdiction to order application of the alternative sentence under the specific facts of this case. See, e.g., United States v. Simpson, 430 F.3d 1177, 1181 (D.C. Cir. 2005) (approving alternative sentence that would apply "if the Guidelines were 'not controlling' but could be looked to 'for whatever assistance . . . [the court] might be able to get from them'"). The February 24th order was not a new sentence, but rather a clarification of the original sentence that made the six day sentence enforceable, and hence appealable, under § 3742(b).

## III

As noted, Cage pled guilty to one count of conspiracy to distribute 500 grams or more of a mixture and substance containing methamphetamine and one count of using a telephone to facilitate a drug trafficking offense. Under her plea agreement, the government agreed that Cage was a minor participant in the criminal activity, that she met the requirements of the safety valve provision, that she did not posses a firearm or other dangerous weapon, and that she accepted responsibility for her criminal conduct. Based on these stipulations, Cage's total offense level was 23. At criminal history category I, this corresponds to a guidelines range of 46 to 57 months and the district court sentenced her at the bottom of that range. It also imposed an alternative sentence, calculated without reference to the Guidelines, of six days' imprisonment.

After Booker was decided, the district court again considered the proper sentence for Cage. It evaluated the proper range under the Guidelines and the factors listed in 18 U.S.C. § 3553(a), and decided to impose the alternative sentence of six days' imprisonment and three years of supervised release.[2] The

_____

[2] Although the Sentencing Guidelines are now advisory following Booker, it has remained common among courts around the country to refer to sentencing decisions that enhance the recommended guideline range under Chapter 5 as "departures." Courts now frequently refer to sentencing decisions that are outside the Guideline ranges under the district court's discretion in applying the § 3553(a) factors as "variances." See, e.g., United States v. Hampton, 441 F.3d 28, 287 (4th Cir. 2006); United States v. Gatewood, 438 F.3d 894, 896-97 (8th Cir. 2006). While recognizing the advisory nature of the Guidelines, this opinion uses this
(continued...)

- 11 -

government appeals this sentencing decision on the grounds that such a short sentence is unreasonable given the gravity of the crimes committed.

**A**

Under Booker, we are required to review district court sentencing decisions for "reasonableness." 543 U.S. at 261. Sentencing decisions must be reversed when a sentence is unreasonable considering the factors enumerated in 18 U.S.C. § 3553(a). Id.

Reasonableness has both procedural and substantive components. See United States v. Kristl, 437 F.3d 1050, 1054-55 (10th Cir. 2006). To be reasonable, a sentence must be "reasoned," or calculated utilizing a legitimate method. Id. As such, sentences based on miscalculations of the Guidelines are considered unreasonable because "the manner in which [they were] determined was unreasonable." Id. Even if a sentence is calculated properly, i.e. the Guidelines were properly applied and the district court clearly considered the § 3553(a) factors and explained its reasoning, a sentence can yet be unreasonable. Id. In this case, there is no allegation that the method by which the sentence was arrived at was improper. Rather, the government simply argues that a sentence of six days' imprisonment was unreasonably short given the gravity of the crimes

---

[2](...continued)
terminology.

- 12 -

and the proper understanding of the application of the § 3553(a) factors in this case.

In Kristl, we held that a sentence within the advisory guidelines range is presumptively reasonable. Id. In this case, we must address whether a sentence that is extremely light when compared to the applicable advisory guidelines range was reasonable. This is an issue of first impression for this court; we have neither explained what causes a sentence below the recommended guidelines range sentence to be unreasonable, nor how such decisions are treated on appeal.[3]

**B**

Given Booker's confusing nature and seemingly internally inconsistent holdings, as well as the voluminous amount of case law it has created, it is easy to lose sight of the source of the Supreme Court's decision: The right to a jury trial enshrined in the Sixth Amendment. The right to a jury trial is not only the right to have a set of fact-finders consider the individual factors at issue in one's case, but also the right to have a democratic cross-section of society sit in judgment. Compare Booker, 543 U.S. at 244 ("[T]he interest in fairness and reliability protected by the right to a jury trial [is] a common-law right that defendants

---

[3] We have twice considered whether a below guideline range sentence is unreasonably high. See United States v. Chavez-Diaz, 444 F.3d 1223 (10th Cir. 2006) (31 month sentence reasonable when the guideline range was 41 to 51 months); United States v. Terrell, 445 F.3d 1261, 2006 U.S. App. LEXIS 9961, slip. op. at 8-11 (10th Cir. April 20, 2006) (63 month sentence not unreasonably high when the guidelines range was 92-115 months).

enjoyed for centuries and . . . is now enshrined in the Sixth Amendment."); with

Blakely v. Washington, 542 U.S. 296, 305-06 (2004) ("Our commitment [is] to . . . the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."); see also William Stuntz, The Political Constitution of Criminal Justice, 119 Harv. L. Rev. 780, 820 (2006) ("Of course, the Sixth Amendment right to a jury trial embodies majoritarianism, by (apparently) guaranteeing local democratic control over the allocation of criminal punishment.").

Many commentators have noted a strong internal contradiction in the Booker decision. See, e.g., M. K. B. Darmer, The Federal Sentencing Guidelines After Blakely and Booker: The Limits of Congressional Tolerance and a Greater Role for Juries, 56 S.C. L. Rev. 533, 564 (2006) ("While Booker A was a natural outgrowth of the Court's recent jurisprudence, Booker B produced a jarring result in attempting to salvage as many current features of the Guidelines as possible while effecting an end-run around the Sixth Amendment requirements Booker A recognized."); Frank O. Bowman III, Punishment and Crime: Beyond Band-Aids: A Proposal for Reconfiguring Federal Sentencing After Booker, 2005 U. Chi. Legal F. 149, 182 (The "mystery about the Booker remedial opinion is how it can possibly be squared with either the announced black-letter rule or the underlying

- 14 -

theory of the <u>Blakely</u> opinion it purports to apply."); Douglas Bloom, <u>United States v. Booker and United States v. Fanfan: The Tireless March of Apprendi and the Intracourt Battle To Save Sentencing Reform</u>, 40 Harv. C.R.-C.L. L. Rev. 539, 556 (2005) (<u>Booker</u>'s "split majority finds itself caught in the paradox it brought upon itself").

Part I of <u>Booker</u>, written by Justice Stevens on behalf of five justices, invalidated the judicial fact-finding that underpinned the Sentencing Guidelines because the Sixth Amendment requires facts to be proven beyond a reasonable doubt to a jury. 543 U.S. at 226. Part II, written by Justice Breyer on behalf of five justices – although only one who was in the majority for Part I – held that the Sentencing Guidelines maintained authority as an advisory source for sentencing decisions. <u>Id.</u> at 244 ("So modified, the Federal Sentencing Act . . . makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges . . . but it permits the court to tailor the sentence in light of other statutory concerns as well.") (citations omitted). Thus, a decision that struck down judicial fact-finding resulted in a system where judges had more rather than less discretion. "The most striking feature of the <u>Booker</u> decision is that the remedy bears no logical relation to the constitutional violation. . . . Trial by jury has no greater role in sentencing than it did before <u>Booker</u>." Michael McConnell, <u>The Booker Mess</u>, 83 Den. U. L. Rev. 665, 677 (2006).

Viewing the Booker decisions through the lens of the competing values underlying the Sixth Amendment provides a searching explanation for this seeming conflict. Part I requires individualized judgment: Sentencing must be done by either by a judge in the exercise of her discretion or by a jury that finds facts to enhance a sentence. Booker, 543 U.S. at 232-33. That is, without the individual attention of a jury to find facts, a defendant cannot constitutionally be sentenced by a judge without discretion to consider all relevant factors under the sentencing statutes. Part II honors the democratic spirit of the amendment by refusing to use the Sixth Amendment to nullify the entirety of Congress's purpose in passing the 1984 Sentencing Act that judicial discretion on sentencing should be limited by the decisions of a publicly accountable body, the Sentencing Commission. See id. at 246 ("The other approach, which we now adopt, would . . . make the guidelines system advisory while maintaining a strong connection between the sentence imposed and the offender's real conduct – a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve.").

When a district court makes a sentencing decision, it must interpret Congress's intentions in passing sentencing laws. The Sentencing Guidelines are an expression of that intent, albeit now in an advisory manner:

> It would be startling to discover that while Congress had created an expert agency, approved the agency's members, directed the agency to promulgate Guidelines, allowed those Guidelines to go into effect,

- 16 -

and adjusted those Guidelines over a period of fifteen years, that the resulting Guidelines did not well serve the underlying congressional purposes [behind sentencing].

United States v. Wilson, 350 F. Supp. 2d 910, 915 (D. Utah 2005).  Booker II holds that the Sixth Amendment does not require invalidating the entirety of Congress's intent to use an insulated but ultimately politically responsive group to check judicial discretion.  Further, it clearly provides that, although the Guidelines are listed as only one of the § 3553(a) factors, they are not just one factor among many.  Instead, the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration when we determine reasonableness.  "[T]he Guidelines 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  Terrell, 445 F.3d at 1265 (quoting United States v. Mykytiuk, 415 F.3d 606, 607 (7th Cir. 2005)).  Because Booker represents a balance between the competing values of the Sixth Amendment, an appellate court reviewing a sentencing decision must take into account not only the individual factors that determine reasonableness listed in § 3553(a), but also should give particular advisory weight to the judgments made by the political process represented in the Guidelines.

This is why, in United States v. Kristl, 437 F.3d at 1054, we held that sentences within the guidelines range are presumptively reasonable.  This rule has been adopted by the Fourth, Fifth, Sixth, Seventh, and Eighth Circuits; it is

rejected by the First, Second, Third, and Ninth Circuits. See United States v. Green, 436 F.3d 449, 457 (4th Cir. 2006); United States v. Alonzo, 435 F.3d 551, 555 (5th Cir. 2006); United States v. Williams, 436 F.3d 706, 708 (6th Cir. 2006); Mykytiuk, 415 F.3d at 606 (adopting presumption in Seventh Circuit); United States v. Lincoln, 413 F.3d 716 (8th Cir. 2005); but see United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006) (en banc); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005); United States v. Cooper, 437 F.3d 324 (3d Cir. 2006); United States v. Cantrell, 433 F.3d 1269 (9th Cir. 2006).[4]

Our holding in Kristl, that within-the-guidelines sentences are entitled to a presumption of reasonableness, speaks to how we should consider sentences outside the guidelines range. We reject the concept that we, as judges, should determine "reasonableness" under § 3553(a) without reference to the fact that the Guidelines represent a critical advisory aspect of the § 3553(a) factors. "The continuing importance of the Guidelines in fashioning reasonable sentences . . . simply reflect that the Guidelines are generally an accurate application of the factors listed in § 3553(a)." Terrell, 445 F.3d at 1265. Booker does not place original sentencing decisions entirely in the discretion of trial judges; the

---

[4] The Eleventh Circuit's jurisprudence on whether sentences inside the applicable guidelines range are presumptively reasonable is less than clear. Its only published opinion on the matter, United States v. Talley, 431 F.3d 784 (11th Cir. 2005), stated: "Although either a defendant or the government can appeal a sentence within the Guidelines range and argue that it is unreasonable, ordinarily we would expect a sentence within the Guidelines range to be reasonable." Id. at 787.

Guidelines – as an expression of the political will of Congress – continue to assert advisory influence on those decisions.  Similarly, Booker should not be interpreted to exempt appellate courts from the influence of Congress's sentiments about reasonableness in sentencing.

C

Cage received a sentence of six days' imprisonment.  Under the Guidelines, the bottom of the applicable sentencing range would have been 46 months.  This discrepancy between the advisory guidelines range and the actual sentence is both extraordinary and unreasonable for crimes of this level.

Several of our sister circuits have held that "[a]n extraordinary departure 'must be supported by extraordinary circumstances.'"  United States v. Kendall, _ F.3d _, 2006 U.S. App. LEXIS 10877 at *5 (8th Cir. May 2, 2006) (quoting United States v. Dalton, 404 F.3d 1029, 1033 (8th Cir. 2005)); see also United States v. Moreland, 437 F.3d 424, 432 (4th Cir. 2006) ("However, when the variance is a substantial one, . . . we must more carefully scrutinize the reasoning offered by the district court in support of the sentence. The farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be."); United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005) ("However, the farther the judge's sentence departs from the guidelines sentence (in either direction – that of greater severity, or that of greater lenity), the more compelling the justification based on factors in section 3553(a) that the

judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed.").

Because this case presents such an extreme divergence from the best estimate of Congress's conception of reasonableness expressed in the Guidelines, it should be considered reasonable only under dramatic facts. Had the comparative difference been smaller but still outside the guidelines range, the district court's decision would not have been presumptively reasonable but an appropriate justification would suffice for this court to determine that it is reasonable. However, where as here, a district court effectively ignores the advice of the Guidelines that the crimes of conspiracy to distribute methamphetamine and using a telephone to facilitate drug trafficking merit a substantial term in prison, we should only treat the actual sentence as being a reasonable application of § 3553(a) factors if the facts of the case are dramatic enough to justify such a divergence from the politically-derived guideline range.[5]

---

[5] The same rules of appellate review must apply to district court sentencing decisions that are above an advisory guidelines range as to those below an advisory guidelines range. See Dean, 414 F.3d at 729. Early evidence about appellate review of sentencing decisions for reasonableness creates concerns that below guidelines-range sentences are treated less deferentially by appellate courts than above guidelines-range sentences. According to the United States Sentencing Commission, nearly three times as many below guidelines-range sentences have been reversed for unreasonableness as have been affirmed as reasonable. See Final Report on the Impact of United States v. Booker On Federal Sentencing, United States Sentencing Commission (March 2006) at 30. In contrast, the same report states that close to seven times as many above guidelines-range sentences have been found reasonable than have been found

(continued...)

When the district court issued its order enforcing the application of the alternative sentence, it clarified its reasons for imposing a six day sentence under Booker.  The reasons given were:  (1) Cage has a son with medical problems, the son's father was jailed following his participation in the criminal conspiracy of which she was a part, and no one else could take care of the child; (2) Cage did not play a major role in the conspiracy and her background, education, work history, family responsibilities, and post-conviction behavior indicated that she was unlikely to commit further crimes; (3) Cage does not have a continuing drug problem and had no previous criminal history; and (4) the time spent in jail was sufficient to impress upon her the wrongfulness of her action.[6]

---

[5](...continued)
unreasonable.  Id.  According to a leading academic chronicler of sentencing decisions, "it seems all post-Booker within-guideline sentences and nearly all above-guidelines sentences are being found reasonable, whereas many below-guideline sentences are being reversed as unreasonable."  Professor Douglas A. Berman, Sorting Through the Circuit Circus, Sentencing Law and Policy, at http://sentencing.typepad.com/sentencing_law_and_policy/2006/04/tracking_reason.html (April 28, 2006).

There have been more downward than upward variances since Booker, see McConnell, The Booker Mess, 83 Den. U. L. Rev. at 675.  Even so, it is difficult to explain the magnitude of the differences in the rates of reversal.  Although this case reverses a below guidelines-range sentence as unreasonable, nothing in it should be read as applying a higher standard to below guidelines-range sentences.

[6]  The district court also said that it was "influenced" by some completely irrelevant commentary from an Assistant United States Attorney.  During the original sentencing hearing, which took place before Booker, the AUSA was asked whether an alternative sentence proposed by the court was legal.  In

(continued...)

It is beyond doubt that these factors are all properly considered under

§ 3553(a). See 18 U.S.C. § 3553(a)(1), (2)(A), (2)(C). The problem with the

sentencing decision, however, is not in the consideration of these factors; it is in

the weight the district court placed on them. Cage's role in the criminal

conspiracy was not central, but neither was it negligible. She repeatedly and

knowingly aided in its operations, took orders and arranged for the delivery of

methamphetamine, transmitted messages among members of the conspiracy,

attempted to arrange for the false registration of vehicles for a drug courier and

transferred cash among members of the conspiracy to aid its objectives.

Although Cage has managed to avoid continuing drug use and did not have a

criminal history, neither of these factors are particularly out of the ordinary.

Nor does her status as a single mother, because the father of her child is in

jail, justify such an extreme variance. We are not insensitive to the problems of

incarcerating a single mother; doing so creates enormous costs for an innocent

child and for society at large. However, we cannot find reasonable a sentencing

---

[6](...continued)
response, the AUSA stated, "Since Ms. Cage did serve some time in jail after her arrest, the Court [c]ould also sentence her to time served, plus five years supervised release, or however much supervised release was appropriate." This testimony only spoke to what was required and possible under the sentencing statute; the court and the AUSA were discussing what types of alternative sentences could apply if the Sentencing Guidelines were struck down. The statement has absolutely nothing to do with what the government thought was proper under § 3553(a). Any judicial reliance on this statement in determining a sentence under § 3553(a) is unreasonable.

decision that would effectively immunize single mothers from criminal sanction aside from supervised release. Her situation is, unfortunately, not very uncommon. The district court noted this itself when it denied a downward departure on the basis of her family ties and responsibilities because it did not fall outside the heartland of cases. Although these facts may justify some discrepancy from the advisory guidelines range, they simply are not dramatic enough to warrant such an extreme downward variance. As such, the district court's sentencing decision was unreasonable.

## IV

The district court had jurisdiction to impose its alternative sentence of six days' imprisonment on Sabrina Cage and the United States filed a timely appeal of this sentencing decision. That decision, however, was unreasonable. We **REVERSE** the district court's sentencing decision and **REMAND** for resentencing.

05-2079, *United States v. Cage*

**TYMKOVICH**, J., concurring.

I concur in the opinion, but write separately to express my views about the district court's jurisdiction to enforce an alternative sentencing.

This is an odd case. The district court imposed two sentences: a guidelines sentence of 46 months, and an alternative sentence of six days to be applied only if the Supreme Court found the Sentencing Guidelines unconstitutional in *United States v. Booker*, 543 U.S. 220 (2005), which was pending at the time of sentencing. The Supreme Court did so, in part, ruling that the mandatory application of the guidelines violated the Sixth Amendment. Although Cage had begun to serve her 46-month sentence, since it violated *Booker*, the district court vacated the sentence and ordered enforcement of the six-day alternative sentence. Unfortunately, the alternative sentence, like the original sentence, was also unlawful: it failed to account for the reasonableness factors set forth in 18 U.S.C. § 3553(a).

The rub here is that Cage waived her right to appeal her sentence pursuant to a plea bargain. And the government had nothing to appeal either. The original sentence was within the then-applicable mandatory sentencing guidelines range, and the alternative sentence was wholly speculative at the time it was pronounced. Ordinarily, either the government or Cage should have appealed her

sentence within thirty days of the court's sentencing in September 2004. Neither did.

Now we are faced with a jurisdictional muddle: both the original and the alternative sentence are unlawful under *Booker*. That leaves us with the questions, when were the sentences final and when could they be appealed?

This conundrum arises from the use of alternative sentences. We first sanctioned them in the era surrounding *Mistretta* when the constitutionality of the sentencing guidelines were in doubt. Courts would announce two sentences, the alternative to be enforced if the sentencing guidelines were determined to be constitutional. *See United States v. Smith*, 888 F.2d 720, 722 n.2 (10th Cir. 1989); *United States v. Garcia*, 893 F.2d 250, 252 n.4 (10th Cir. 1989); *United States v. Stokes*, 986 F.2d 1431 at *4 (10th Cir. Feb. 23, 1993) (unpublished); *United States v. Scott*, 16 F.3d 418 at *2 (10th Cir. Feb. 7, 1994) (unpublished).

After a period of stability since *Mistretta*, recent years have taught us that uncertainty may instead be the new norm in federal sentencing law. Thus, prior to the Supreme Court's decision in *Booker*, many sentencing courts again announced alternative sentences. On appeal we relied on the alternative sentences in our plain or harmless error analysis. *United States v. Gonzales-Huerta*, 403 F.3d 727 (10th Cir. 2005) (en banc).

In times of uncertainty, alternative sentencing appears tempting: if district courts are able to predict future legal developments, the interests of judicial

efficiency are arguably served by announcing alternative sentences and avoiding the burdens of resentencing. Yet, we should not encourage alternative sentencing for a variety of reasons. First, the practice fundamentally conflicts with the rule that a court may enter only one final judgment. Second, alternative sentences undermine finality, by allowing the sentencing court to peer into the future and retain power over a defendant's fate based on developments at the Supreme Court, the sentencing commission, or perhaps even the Congress. Third, given the unsettled nature of sentencing law in our era, alternative sentences frustrate certainty for both the government and the defendant: who is to appeal what, and when are they to appeal it? Finally, alternative sentences can create jurisdictional difficulties, as in this case, because of the necessary legal fiction that they are "imposed" at the time of judgment even though they may never take effect unless the condition precedent is triggered.

Other courts have recognized these problems and concluded that alternative sentences are not worth the trouble, and are generally unenforceable. For example, in a recent case, *United States v. Booker*, 436 F.3d 238 (D.C. Cir. 2006), the D.C. Circuit rightly held that "an 'alternative sentence' is not really a 'sentence'. . . . Once the court pronounces a criminal sentence—which constitutes a 'judgment'—the court has no lawful authority to supplement that sentence with a second one." *Id.* at 245. The court went on to hold that a

sentencing court, after a sentence has been announced, has no authority to pronounce a different alternative sentence. I think this reasoning is correct.

Our precedents, however, sanction the use of alternative sentences. We have used alternative sentences to guide the analysis in plain or harmless error as an indication of whether the court might impose a different sentence on remand. While these cases are not directly on point, our *Mistretta* era cases allowed district courts to enforce alternative sentence long after the time to appeal had run. *See United States v. Scott*, 16 F.3d 418 at *2 (10th Cir. Feb. 7, 1994) (unpublished). Accordingly, our cases seem to allow district courts to enforce alternative sentences, and the government has not argued that courts lack the authority to do so. Given the Supreme Court's holding in *Booker*, however, Cage's sentence here has not been subject to the proper application of the § 3553 factors. Remand is thus the correct result. Nevertheless, the circumstances of this case well illustrate why alternative sentences should be eliminated.